# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                                )
        v.                    )
                                )
FRANCIS P. SALEMME     )    CR. NO. 04-10323-RGS
                                )

## AFFIDAVIT OF DANIEL M. DOHERTY IN SUPPORT OF PRE-TRIAL DETENTION OF FRANCIS P. SALEMME

I, Daniel M. Doherty, being duly sworn, state:

I am a Special Agent with the Drug Enforcement Administration ("D.E.A.") assigned to the Boston, Massachusetts, Field Division. I have been so assigned for more than 20 years. I was the D.E.A. case agent assigned to the prosecution of United States v. Stephen J. Flemmi, et al., Crim. No. 99-10371-RGS, and I was the D.E.A. case agent assigned to the prosecution of United States v. Francis P. Salemme, et al., Crim. No. 94-10287-MLW. I am currently the DEA case agent assigned to this prosecution of FRANCIS P. SALEMME.

In the past, I have monitored and supervised the monitoring of numerous hours of conversations intercepted through the use of court-authorized and consensual electronic surveillance; I have conducted and supervised physical surveillances of persons involved in organized crime; I have participated in search warrants of organized crime locations; I have debriefed numerous

cooperating witnesses such as SALEMME'S former criminal partner, Stephen Flemmi; and I have supervised undercover operations targeting organized crime activities. I have also worked closely with other law enforcement agents experienced in the investigation of organized crime operations.

I. SUMMARY

FRANCIS P. SALEMME has been a prominent criminal in the Boston area for decades. On two prior occasions in 1969 and 1995, SALEMME became and remained a fugitive from justice for extended periods of time. In 1973, after being captured in New York City, SALEMME was convicted in state court for his role in the 1968 bombing of an attorney who represented a government witness (the victim, John Fitzgerald, lost his leg and almost his life when his car exploded after SALEMME and others successfully planted dynamite in the car). After being released from prison in 1988, SALEMME promptly resumed his life of crime and eventually became Boss of the New England Family of La Cosa Nostra ("LCN"), previously known as the Patriarca Family. Shortly after a warrant was issued for his arrest in 1995, SALEMME fled Massachusetts and was a fugitive for eight months until he was captured in Florida in August of 1995. While detained during the Salemme litigation before the Honorable Mark L. Wolf, SALEMME demonstrated his disregard for court orders and

2

violated a June 1997 federal protective order by disclosing sealed documents to an unauthorized individual.

In the instant Indictment, SALEMME is charged in two counts with obstruction of justice and making false statements relating to his false denial of information relating to, and his involvement in, the murder of Stephen DiSarro. I have been advised by government counsel that under the applicable U.S. Sentencing Guidelines (U.S.S.G. §2J1.1(c) and U.S.S.G. §2X3.1) and relevant First Circuit precedent (United States v. John Connolly, 341 F.3d 16 (1st Cir. 2003), SALEMME (now 71 years old) is facing 10 years' imprisonment.

At the time of his indictment in 1995, SALEMME was the Boss of the New England Family of La Cosa Nostra ("LCN"). Additionally, prior to his capture in Florida in the summer of 1995, SALEMME had been closely associated with several violent members of the so-called Winter Hill Gang (e.g., Stephen J. Flemmi) for many years. SALEMME's propensity for violence is shown by his prior convictions[1] and by the very fact that SALEMME was formerly a prominent member of La Cosa Nostra.

---

[1] In addition to his 1973 conviction stemming from the car bombing of attorney John Fitzgerald, SALEMME was convicted in West Roxbury district court in 1965 of assault and battery. In December of 1999, SALEMME pled guilty to all counts (including RICO charges and numerous extortion counts) of the indictment in United States v. Francis P. Salemme, et al., Crim. No. 94-10287-MLW.

3

In light of the two prior occasions when he became a fugitive, and due to the fact that he is now 71 years old and facing ten years in prison, SALEMME presents an extremely grave risk of flight. Not only are the present charges against SALEMME serious, but his personal track record strongly suggests that he will flee again if given the opportunity to do so. Likewise, there is a serious risk that if released pending trial, SALEMME would engage in acts of obstruction of justice. In addition to his participation in the vicious assault on attorney Fitzgerald, SALEMME's former membership (and leadership) in the LCN demonstrates that he is willing to engage in the acts of intimidation and obstruction of justice that are often required as part of LCN membership. Finally, as demonstrated by SALEMME's 1997 violation of a federal protective order, it is highly likely that SALEMME would attempt to subvert and ignore any conditions of release which might be imposed by this Court. Indeed, when SALEMME's own brother, John "Jackie" Salemme, was released on bail in United States v. John Salemme, Cr.No. 96-10307-RGS, he (Jackie Salemme) subverted a federal protective order regarding highly sensitive sealed documents and thereby violated his own conditions of release.

## II.   THE DEFENDANT

As evidenced by SALEMME's recent conviction before Judge Wolf on RICO charges and numerous extortion charges, SALEMME has

4

a long history of making money through criminal activity rather than through legitimate employment. Throughout his adult life, FRANCIS P. SALEMME has been associated with two closely allied criminal groups operating in the Boston area and elsewhere. Since at least 1979, Stephen J. Flemmi and James J. Bulger were the leaders of a violent criminal organization known as the Winter Hill Gang, which was originally based in Somerville, Massachusetts and more recently operated out of South Boston and elsewhere. The Winter Hill Gang had a close working relationship with members of the New England Family of the LCN for an extended period of time. When SALEMME became the Boss of the New England LCN Family, the association between members of the Winter Hill Gang and members of the New England LCN Family became even closer due to SALEMME's long time criminal alliance with Stephen J. Flemmi, who is now a cooperating witness in this case.

SALEMME is currently facing two federal charges which arise from his attempt in November of 1999 to mislead federal investigators and thwart an investigation into the disappearance and murder of Stephen DiSarro. Investigators have recently confirmed that SALEMME was in fact present when DiSarro was murdered.

1.   Risk of Flight

I strongly believe that SALEMME is a risk of flight. After being indicted in 1995, SALEMME promptly fled Massachusetts and

5

was a fugitive for eight months until he was arrested in Florida in August of 1995. Similarly, in 1969, after being indicted for his role in the attorney Fitzgerald bombing, SALEMME promptly fled Massachusetts and was a fugitive for approximately four years until he was arrested in New York City in 1973. Based on SALEMME's ability to utilize his own prior fugitive experience and the fact that he is now facing the likelihood of spending the rest of his life in jail if convicted of the pending charges, I believe SALEMME will do exactly the same thing, i.e. flee, if he is released on bail in this case.

2. Inadequacy of Conditions of Release

It is my strong belief that SALEMME is highly unlikely to abide by any Court orders regarding conditions of release. For example, SALEMME violated Judge Wolf's June 26, 1997 protective order that prohibited disclosure of certain documents to anyone who was not an "Authorized Individual" (as defined by Judge Wolf's 6/26/97 order). During the course of investigating how and why numerous sealed F.B.I. 209 reports were improperly disclosed to an unauthorized individual in February of 1999, investigators questioned a former inmate who had been incarcerated with defendant Salemme. Essentially, this individual indicated that SALEMME and his former codefendant, Robert DeLuca, knowingly and willfully gave him access to numerous sealed documents (including F.B.I. 209 reports from

6

former codefendants Flemmi's and Bulger's informant files) while he was incarcerated with SALEMME and Deluca in the fall of 1998 and early 1999. This former inmate, who was not an "Authorized Individual" within the meaning of paragraph nine of the Court's June 26, 1997 protective order, read the sealed documents on a "nightly" basis and "often" discussed them with SALEMME. Both SALEMME and Deluca stressed the importance of not letting anyone know that he, the former inmate, was looking at the sealed documents. This flagrant disobedience of a court order indicates to me that SALEMME will not obey any bail orders in this case.

Of course, SALEMME is also a dangerous individual with a serious criminal record who has murdered people in the past and who is highly unlikely to be deterred by court orders regarding bail when he now faces the prospect of spending the rest of his life in prison.

III.  CONCLUSION

In light of all of the foregoing, I believe that there is no condition or combination of conditions for FRANCIS P. SALEMME that will ensure the defendant's appearance at trial and will ensure that the defendant does not engage in efforts to obstruct

justice.

_____
DANIEL M. DOHERTY
Special Agent
Drug Enforcement Administration


Sworn and subscribed to before me this 9th day of November,

2004.

_____
NOTARY PUBLIC


MY COMMISSION EXPIRES:

ERNEST S. TASSCO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 11, 2009

8

EXH 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COPY

Docket No. 04-10323-RGS

UNITED STATES OF AMERICA          .
          Plaintiff                .
                                   .
                                   .
                                   .
          v.                       .
                                   .
FRANCIS SALEMME                    .
          Defendant                .
                                   .
                                   .

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE JOYCE LONDON ALEXANDER
UNITED STATES MAGISTRATE JUDGE
HELD ON
NOVEMBER 29, 2004

APPEARANCES:

For the government:  Brian T. Kelly, Esquire, Fred Wyshak, Jr.,
Esquire, United States Attorney's Office, John Joseph Moakley
Federal Courthouse, 1 Courthouse Way, Suite 9200, Boston, MA
02210, 617-748-3197.


For the defendant, Francis Salemme:  Stephen J. Weymouth,
Esquire, Law Office of Stephen J. Weymouth, Suite 3, 65a
Atlantic Ave, Boston, MA 02110, 617-573-9598.




Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

_____

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

2

**I N D E X**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| Daniel Doherty | 4 | 10 | -- | -- |

| EXHIBITS | DESCRIPTION | IN EVIDENCE |
|----------|-------------|-------------|
| **Government's:** | | |
| 1 | Affidavit | 5 |
| **Defendant's:** | | |
| A | Document | 59 |

*Maryann V. Young*
**Certified Court Transcriber**
**(508) 384-2003**

3

1          P R O C E E D I N G S

2          Today's date is November 29, 2004.  The Court will

3   now hear the case of United States v. Francis Salemme, Criminal

4   Case No. CR 04-10323.  Will the attorneys please identify

5   themselves for the record.

6          MR. KELLY:  Yes, good afternoon--

7          THE COURT:  Good afternoon.

8          MR. KELLY:  -- Brian Kelly and Fred Wyshak for the

9   United States.

10         MR. WEYMOUTH:  Stephen Weymouth representing

11  Mr. Salemme.

12         THE COURT:  Good afternoon.  Are we ready to proceed

13  with the detention hearing?

14         MR. KELLY:  Yes, your Honor.

15         MR. WEYMOUTH:  Yes, your Honor.

16         THE COURT:  The government may proceed.

17         MR. KELLY:  Yes, the United States would call Agent

18  Dan Doherty to the witness stand please.

19         THE COURT:  And let the record reflect that this

20  detention hearing is pursuant to an indictment, and pursuant to

21  the United States v. Vargas, an indictment is a finding of

22  probable cause.

23      (Government witness, Daniel M. Doherty, sworn)

24         THE CLERK:  Please state your full name and spell

25  your last name for the record.

Direct - Doherty                                    4

1          THE WITNESS:   Daniel M. Doherty, D-O-H-E-R-T-Y.

2          THE CLERK:   You may be seated.

3                      DIRECT EXAMINATION

4  BY MR. KELLY:

5  Q    Sir, who do you work for?

6  A    The Drug Enforcement Administration.

7  Q    And how long have you been with the DEA?

8  Twenty-one years.

9  Q    And where are you currently stationed?

10  A    I'm assigned to the New England Field Division, and I'm

11  assigned to the Boston Divisional Office.

12  Q    Are you the DEA case agent on this pending indictment?

13  A    Yes, I am.

14  Q    And have you filed an affidavit in connection with this

15  detention hearing?

16  A    Yes, I have.

17  Q    I'd like to show you Government's Exhibit 1.  Is that a

18  copy of your affidavit, which you signed and was attached to

19  the government's original motion for detention, sir?

20  A    Yes, it is.

21          MR. KELLY:   I'd like to move Exhibit 1 into evidence,

22  your Honor.

23          THE COURT:   Without objection?

24          MR. WEYMOUTH:   No objection.

25          THE CLERK:   Government's Exhibit 1.

1   BY MR. KELLY:

2   Q    Now, sir, were you the DEA case agent on a recent

3   prosecution of defendant, Frank Salemme, before Judge Wolf?

4   A    Yes, I was.

5   Q    And was he convicted in that case?

6   A    Yes, he was.

7   Q    Of what?

8   A    Racketeering charges and extortion charges.

9   Q    Any other, in addition to the extortion charges, any other

10  predicate act of violence?

11  A    Yes, a predicate act of the attempted murder and bombing

12  of Attorney John Fitzgerald.

13  Q    And who is John Fitzgerald?

14  A    He was a defense attorney representing Joseph Barbosa.

15  Q    A cooperating witness?

16  A    That's correct.

17  Q    And, on these charges before Judge Wolf, Mr. Salemme pled

18  guilty, correct?

19  A    Yes, he did.

20  Q    And the RICO count that he plead guilty to, did that

21  indicate that he was the local Mafia boss as of 1991 in Boston?

22  A    Yes, it did.

23  Q    Getting to this particular case, Agent Doherty, do you

24  believe that defendant Salemme is a risk of flight?

25  A    Yes, I do.

1   Q    Why?

2   A    Based on two prior occasions when Mr. Salemme was faced

3   with an indictment and facing serious charges including

4   considerable prison time, he fled, both in 1969 and then again

5   in 1995.

6   Q    So he has experience as a fugitive, Mr. Salemme?

7   A    That's correct.

8   Q    Is there anything else that suggests--

9        THE COURT:   Is this pre--

10  Q    -- to you that he might not appear in court?

11       THE COURT:   -- pre, pre--

12       MR. KELLY:   I'm sorry?

13       THE COURT:   Pre, pre-conviction?

14       MR. KELLY:   I'll ask the agent.

15  BY MR. KELLY:

16  Q    On the prior occasions, sir, were both those occasions

17  when he fled, prior to being convicted?

18  A    Yes, they were.

19  Q    And do, do both of those occasions suggest to you that he

20  has substantial experience living as a fugitive?

21  A    Yes.

22  Q    And--

23  A    The first time in 1969 he was a fugitive until

24  approximately 1973, and during the second period time, he was a

25  fugitive in 1995 for approximately eight months.

Direct - Doherty                                                    7

1   Q    And are there any other factors which suggest to you that

2   he's a risk of flight?

3   A    Yes, based on the present indictment which also he's

4   facing a considerable lengthy prison sentence.

5   Q    And how old is he?

6   A    Mr. Salemme's 71, 72 years of age.

7   Q    And given his age, do you, do you think that the fact that

8   he's facing a substantial time in this case suggests to you he

9   might flea again?

10  A    Yes.

11  Q    Do you believe Mr. Salemme is a violent individual?

12  A    Yes, I do.

13  Q    Why is that?

14  A    Basically, Mr. Salemme, his entire adult life has been

15  involved in criminal activity.  He's pled guilty to the past

16  indictment in 1995, which included racketeering charges,

17  extortion charges which were crimes of violence.  Additionally,

18  the bombing of Attorney Fitzgerald, and he's been involved in

19  murders in the past.

20  Q    And do you believe Mr. Salemme might attempt to obstruct

21  justice if released in this case?

22  A    Yes.

23  Q    Why?

24  A    In the 1995 case in which he was held in pre-detention,

25  there was a judicial court order, a protective order on all

Direct - Doherty

8

1    documents, and Mr. Salemme violated that judicial court order.

2    Q    So, even while incarcerated, he violated a court order

3    most recently in front of Judge Wolf?

4    A    That's correct.

5    Q    And, sir, based upon your experience and investigation, do

6    you believe the underlying case is a strong one?

7    A    Yes.

8    Q    Why?

9    A    For several reasons.  First of all, in 1999, Mr. Salemme

10   participated in a proffer interview as part of his plea

11   agreement deal.  And during the proffer interview, he was

12   questioned regarding the murder of, the disappearance/murder of

13   Stephen DiSarro.  At that time, Mr. Salemme indicated he was

14   not involved and had no information whatsoever regarding it.

15   In fact gave a story implicating others in a possible motive to

16   have Mr. DiSarro murdered.  We've spoken to several individuals

17   mentioned in that story, and they've denied any involvement,

18   and in fact we've, we believe we've disproved that version of

19   the story.

20         Second of all--

21   Q    Well, the indictment charges several different lies,

22   correct?

23   A    Yes, it does.

24   Q    And, one of the lies that's charged is that he, he misled

25   prosecutors and investigators with a phony story about the

Direct - Doherty                                              9

1    DiSarro murder, right?

2    A.    Yes, during a--

3          THE COURT:  Could you spell the last name of the

4    person please?

5          THE WITNESS:  DiSarro.  D-I-S-A-R-R-O.

6    BY MR. KELLY:

7    Q.    And with respect to that phony story, you and other

8    investigators have actually gone out and interviewed several

9    witnesses which, who have denied his story; is that correct?

10   A.    That's correct.

11   Q.    And, additionally, the indictment charges in the

12   alternative additional lies, lies that Mr. Salemme said he made

13   false statements about his knowledge regarding the

14   disappearance and/or his involvement with, the second way to

15   prove this case; is that correct?

16   A.    That's correct.

17   Q.    And in your opinion, do we have a way of proving that as

18   well?

19   A.    Yes.  We have an eyewitness to the murder, an individual

20   who's been involved in criminal activity with Mr. Salemme

21   dating back to the 1960's, in fact, participated in murders in

22   the past with Mr. Salemme.

23   Q.    And do you believe your investigation has uncovered a

24   strong reason or motive for Mr. Salemme's lies to, to the

25   government in this regard?

1  A    Yes.  Primarily, Mr. Salemme would be protecting his

2  brother who has also been implicated in Mr. DiSarro's

3  disappearance and murder.  Also protect memory and name of his

4  son, who's also been implicated, and also as part of the

5  proffer agreement, would have enhanced his own sentence

6  potentially at the time of a plea agreement with additional

7  time given to himself.

8           MR. KELLY:  Your Honor, nothing further for him.

9           THE COURT:  You may cross-examine.

10          MR. WEYMOUTH:  Thank you, your honor.

11                        CROSS EXAMINATION

12  EY MR. WEYMOUTH:

13  Ç    Good afternoon, agent.

14  A.   Good afternoon.

15  Ç    Do you have a copy of your indictment, your affidavit in

16  front of you?

17  A.   I do.

18  Q    And did you have a chance to review your affidavit before

19  coming in to testify today?

20  A.   I looked at it earlier today, yes.

21  Q    And it's fair to say that there are other documents that

22  you reviewed before your testimony today that, actually not

23  only before your testimony, but went into the preparation of

24  this affidavit.  Is that fair to say?

25  A    Yes.

1    Q     And one of those documents that you referred to that went

2    into the preparation of this affidavit is a two-page statement

3    from a William St. Croix; is that fair to say?

4    A     I did look at that.

5    Q     And who is William St. Croix?

6    A     He is the son of Stephen Flemmi.

7    Q     And when you talked earlier about a witness who could

8    basically strengthen or is the reason that the government in

9    your opinion has a strong case against Mr. Salemme is in fact

10   Steve Flemmi; is that correct?

11   A     Yes.

12   Q     He's allegedly given you a statement about what supposedly

13   happened May of 1993 around the disappearance of Mr. DiSarro?

14   A     Yes, he has.

15   Q     And he began cooperating with the DEA and with you back in

16   the fall of 2003?

17   A     That's correct.

18   Q     And that was shortly after he pleaded guilty to his series

19   cf indictments that you referred to in your affidavit on page 1

20   as No. 99-10371-RGS.  Is that fair to say?

21   A     That's correct.

22   Q     And I note that in your affidavit you write the words et

23   al, that means there was more than one defendant named in this

24   particular indictment, correct?

25   A     Yes.

1          THE COURT:  Could you, could you repeat what you

2    just stated?

3          MR. WEYMOUTH:  I'm sorry, your Honor.

4          THE COURT:  You note in the affidavit you refer to?

5          MR. WEYMOUTH:  Et e-t-

6          THE COURT:  Oh, okay.

7          MR. WEYMOUTH:  a-l--

8          THE COURT:  All right.

9          MR. WEYMOUTH:  -- meaning that there's other

10   individuals or other named parties that you did not name in

11   your affidavit specifically, fair to say?

12   BY MR. WEYMOUTH:

13   Q    Is that correct?

14   A    Yes.

15   Q    How many other individuals are referred to under et al on

16   page 1 of your indictment?

17         MR. KELLY:  Just objection for clarifications.  Two

18   different cases referenced here.  Is it the Flemmi case before

19   Judge Stearns and there's the Salemme case before Judge Wolf.

20   I'm not sure--

21   BY MR. WEYMOUTH:

22   Q    I identified it as 99-10371-RGS.  That stands for Judge

23   Stearns, does it not?

24   A    Yes, it does.

25   Q    So let's talk about that one and leave the other one off