Cross - Doherty                                          38

1  A     Violent activities within prison?

2  Q     Well, that's where he was, wasn't it?  During that period

3  of time, do you know that he engaged in violent activities

4  while he was locked up awaiting disposition of the case?

5  A     Well, at the time of his indictment, '95, Mr. Salemme was,

6  he, basically the head of the La Costa Nostra in Boston and, I

7  mean, for several years while he was incarcerated also.  So,

8  we, criminal activities of the LCN by its very nature, are

9  violent or often violent.

10 Q     Do you have any independent knowledge, other than the

11 allegations that he was still a head of the LCN while he was

12 locked up, Mr. Salemme engaged in any violent activities

13 himself while locked up from 1995 to 1999?

14 A     Well, extortion payments were still being made to the

15 Salemme is at that point in time.  Money was still coming in at

16 that point in time.

17 Q     Anything else?

18 A     I'm trying to think of the date of several homicides that

19 occurred.  I just don't have the date off the top of my head,

20 so I'd have to check that.

21 Q     So your testimony is is that there were several homicides

22 that occurred in prisons--

23 A     No.  There was a homicide that occurred in Boston that

24 Mr. Salemme has been linked to, you know, source information.

25 Q     Source information?

*Maryann V. Young*
Certified Court Transcriber
(508) 384-2003

1  A    That's correct.
2  Q    An informant's source information?
3  A    Yes.
4  Q    A criminal informant source information?
5  A    Yes.
6  Q    And, in fact, the main witness in this particular case
7  against Mr. Salemme is Stephen Flemmi; is that right?
8  A    He's one of the main witnesses.
9  Q    One of the main witnesses, and a main witness who has been
10 debriefed by you for several months including a lengthy
11 debriefing session in October of '03 in which he makes
12 allegations about a lot of people, including Frank Salemme?
13 A    Yes.  It, basically criminal activity from the, from the
14 sixties right up to the present day, yes.
15 Q    And during the period of time that Steve Flemmi was
16 engaging in the vicious, horrendous crimes he was engaging in,
17 he was an informant working with the FBI?
18 A    That's correct.
19 Q    And, in fact, you make reference on pages 1 and 2 of your
20 affidavit, I have debriefed numerous cooperating witnesses such
21 as Salemme's former criminal partner, Stephen Flemmi.  Do you
22 see where I'm reading?  The bottom of page 1, top of page 2?
23 A    Yes.
24 Q    And when you say Salemme's former criminal partner,
25 Stephen Flemmi, you're talking about the relationship they had

1   with each other back in the period of the late 50's and early

2   60's until the 1969 flee, flight if you would, of Mr. Salemme,

3   correct?

4   A     And then they were on the lam for a while, together.

5   Q     Do you, did Mr. Flemmi tell you that?

6   A     Yes. I believe actually Mr. Salemme also made statements

7   to that effect, to that effect.

8   Q     And that was on the run in 1969?

9   A     Early 70's.

10  Q     Early 70's. In fact, Flemmi went to Montreal, didn't he?

11  A     At some point, yes.

12  Q     And Flemmi was notified by someone, maybe Agent Connolly,

13  that it was okay for him to return to the United States, from

14  Montreal in 1972?

15  A     I don't believe Agent Connolly, no.

16  Q     How about Agent Condon?

17  A     I don't believe Agent Condon either.

18  Q     But in this, in this affidavit, you indicate Salemme's

19  former criminal partner, Stephen Flemmi. Isn't it true that

20  during just about this whole period of time that you refer to

21  former criminal partner, Flemmi was an informant of some type

22  or other, informing against not only Mr. Salemme, but just

23  about everyone else involved in the LCN in Boston during this

24  period of time?

25  A     During which period of time are you talking?

1 Q    '65 on, from the time that Mr. Flemmi became an informant
2 working with the FBI.
3 A    From '65 on, Mr. Flemmi was an informant, yes.
4 Q    While at the same time, you call Mr. Flemmi Mr. Salemme's
5 former criminal partner, when in fact, Mr. Flemmi is an
6 informant working for the FBI at the same time, correct?
7 A    That's correct.
8 Q    And he's your main witness in this particular case?
9 A    He's one of the main witnesses, yes.
10 Q    Now, after Mr. Salemme was sentenced by Judge Wolf, he
11 continued, he, Mr. Salemme, continued his cooperation about
12 certain matters in this court before Judge Wolf.  Fair to say?
13 A    I believe he was still speaking to the FBI agents involved
14 in the Connolly prosecution, yes.
15 Q    And, and, and you know that prior counsel for Mr. Salemme
16 filed a Rule 35 motion, or filed some motion before Judge Wolf
17 that resulted in a hearing before Judge Wolf on a request made
18 by Mr. Salemme that his sentence be reduced because of his
19 cooperation.  You know that, don't you?
20 A    I am aware of that.
21 Q    And the, there was disagreement, was there not, from this
22 office, the U.S. Attorney's office here, with the amount of
23 reduced sentence that Mr. Salemme's attorney was looking for
24 versus what they were looking for.  There was a difference of
25 opinion.

1  A    That's accurate.

2  Q    And even the government was willing to recommend and to
3  tell Judge Wolf that Mr. Salemme deserved a reduction in his
4  sentence because of the cooperation that he had given in
5  connection with very important prosecutions, correct?

6  A    The government, yes, did recommend a reduction relative to
7  his cooperation in the Connolly prosecution.

8  Q    Do you remember what the recommendation was?

9  A    By the government?

10 Q    Uh-huh.

11 A    The sentence he eventually got?

12 Q    Nope.  What was the recommendation--

13 A    What the recommendation was?

14 Q    -- made by the U.S. Attorney?

15 A    I think it was a year off.

16 Q    That's twelve months?

17 A    Approximately--

18 Q    Is it?

19 A    Yes.

20 Q    I'm sorry.

21 A    Approximately, yes.

22 Q    And, in fact the reduced reduction in sentence was more
23 along the lines of 28 months, wasn't it?

24 A    I think it was, yes.

25 Q    Two and a half times greater than the one-year recommended

1  by the U.S. Attorneys, correct?

2  A    If, if the numbers are correct, that would be correct,
3  yes.

4  Q    And the U.S. Attorneys, would you say, were not happy by
5  the 28 month reduction in sentence given by Judge Wolf to
6  Mr. Salemme, is that fair to say?

7  A    At the time of the hearing, I think there were, two
8  different, two different camps.  I mean there were the
9  prosecutors involved in the Connolly prosecution were
10 advocating that Mr. Salemme did a good job and deserved a
11 considerable amount of time off, and the prosecutors involved
12 in the overall case thought, and I think it was on the record,
13 that Mr. Salemme had not been totally candid with the
14 government.

15 Q    So, it's fair to say that, forgive me for being naïve,
16 that the government isn't one big entity acting together in
17 connection with the prosecution of criminal activity.  Is that
18 fair to say?

19           MR. KELLY:  Objection.  Relevance, your Honor.
20           THE COURT:  Yes, I don't understand the question.
21           MR. WEYMOUTH:  I'll withdraw the question.
22 BY MR. WEYMOUTH:
23 Q    What do you mean by two different camps?
24 A    The Connolly prosecution was prosecuted by a separate
25 group of prosecutors, separate group of agents, and they were

1  recommending, you know, specific period of time off.  I
2  believe the office came down with what the recommendation
3  should be.  I mean, so, I think the office was speaking with
4  one voice at that point in time.  I do know at the time of the
5  hearing, a government prosecutor put on the record that
6  Mr. Salemme had not been, in, you know, his opinion totally
7  candid with the government.
8  Q    Well, is that really what he said or is that what you just
9  sort of--
10 A    That's my recollection.
11 Q    That's your recollection.  What he said in his filing was,
12 is that he knew that there were some concerns in the other camp
13 that Mr. Salemme had not been 100% forthcoming about a
14 particular incident.  Isn't that what he wrote, not what he
15 said, but what he wrote in his filing?
16 A    I'm talking about the hearing itself.  I don't know what
17 was, I don't recall what was written, but I'm talking about the
18 hearing itself.  I'm sure the transcript is more than likely
19 available.
20 Q    That in fact that he was aware, he being the gentleman
21 from not Washington but from some other jurisdiction--
22         MR. KELLY:  Objection.  Asked and answered.
23         MR. WEYMOUTH:  -- this office.
24         THE COURT:  Pardon?
25         MR. KELLY:  Asked and answered. I mean, he admitted

Cross - Doherty 45

1 he doesn't know exactly what the transcript is going to
2 reflect.
3     THE COURT: Sustained.
4 BY MR. WEYMOUTH:
5 Q  So, when you say that the office was speaking with one
6 voice, what office are you speaking about?
7 A  The United States Attorney's office in Boston.
8 Q  And that's one camp that you referred to earlier on,
9 correct?
10 A  But that was the, the guiding force behind the
11 recommendation. I mean the U.S. Attorney for the district had
12 the final say so in the, in the case.
13 Q  But this U.S. Attorney in this district was not the U.S.
14 Attorney that prosecuted criminal activity that took place in
15 this jurisdiction by an FBI agent, correct?
16 A  Again, as I previously stated, there was a special
17 prosecutor assigned outside the jurisdiction as well as agents
18 from the bureau that were assigned from outside this
19 jurisdiction.
20 Q  And that happened in this particular case, why, if you
21 know?
22 A  Because of the corruption issues, you know, involving the
23 FBI and the allegations against Mr. Connolly.
24 Q  And it's your opinion that a conclusion was reached by
25 this office that perhaps prosecution of Mr. Connolly should b

*Maryann V. Young*
Certified Court Transcriber
(508) 384-2003

1  handled and conducted by someone other than assistants
2  assigned to this office; is that correct?
3  A    I, I think that was a decision made by this office and the
4  main justice.
5  Q    But you, and it's fair to say that when the discussion was
6  taking place before Judge Wolf on the motion for reduction of
7  sentence, this office was asking for a twelve month reduction.
8  A    I believe, don't quote me on the figure, I believe that's
9  what it was.
10 Q    And this office was unhappy with the reduction given
11 Mr. Salemme by Judge Wolf, correct?
12          MR. KELLY:  Objection.  Relevance?
13          THE COURT:  Counsel?
14          MR. WEYMOUTH:  Motive for prosecution, Judge.  Motive
15 per se--
16          THE COURT:  Prosecution, what prosecution?
17          MR. WEYMOUTH:  This prosecution.
18          THE COURT:  The, the justice is unhappy?
19          MR. WEYMOUTH:  That this office is unhappy.  I'm
20 sorry, did you--
21          THE COURT:  How, how many more questions do you have
22 in this, in this area?
23          MR. WEYMOUTH:  Not too many, Judge.
24          THE COURT:  Well, let me take a short recess.
25     (Court in recess).

*Maryann V. Young*
**Certified Court Transcriber**
**(508) 384-2003**

1           THE COURT:  Just one moment, counsel.

2           MR. WEYMOUTH:  May I proceed, Judge?

3           THE COURT:  Yes.

4  BY MR. WEYMOUTH:

5  Q    Agent Doherty, you testified earlier on and in your

6  affidavit that you were one of the case agents assigned to this

7  Flemmi, et al prosecution under the No. 99-10371 as well as the

8  Frank Salemme, et al 94-10287, fair?

9  A    Yes.

10 Q    Directing your attention please to the second, the latter

11 of the two, the 94-10287, did you, were you still involved in

12 the investigation and prosecution of the case when those

13 lengthy motion to dismiss hearings were held before Judge Wolf

14 in 1998, maybe '97, and part of 1999?

15 A    You mean the Franks hearings?

16 Q    The Franks hearings.

17 A    Yes, I was.

18 Q    And did you testify at some point?

19 A    I did not.

20 Q    And it's fair to say that among a myriad of witnesses who

21 testified, Stevie Flemmi was among those witnesses who

22 testified; is that correct?

23 A    At some point, yes.

24 Q    And you'd agree with me, would you not, that the

25 testimony, some of the testimony he gave was false during his

1    testimony at the Franks hearing?

2    A    I don't recall what Mr. Flemmi testified. I know there

3    were affidavits he filed that, that may have been part of it

4    that were false.

5    Q    You think that there were affidavits that Mr. Flemmi filed

6    in support of something in connection with--

7    A    During the Frank, during the Franks hearings he had filed

8    several affidavits.

9    Q    But wasn't there one point where he asked a question about

10   who it was that tipped him off to the indictments and he

11   answered it was John Morris; is that correct?

12   A    That, that's correct.

13   Q    That's perjury, isn't it?

14   A    That was a, yes, that was a false statement, yes, sir.

15   Q    And that was made under oath from the witness stand?

16   A    Yes, it was.

17   Q    And in addition, some of the affidavits he submitted under

18   oath in support of his position to a court of law were false?

19   A    Yes.

20   Q    Correct. And there's no difference between submitting an

21   affidavit before a court of law and testifying under oath like

22   you're doing today, as far as being truthful; is that fair to

23   say?

24   A    That's fair to say.

25   Q    And there's nothing different from lying in an affidavit

1  than there is from lying on the stand as far as the court is
2  concerned; is that fair to say?
3  A    Yes.
4  Q    So you have a witness in this case who is the, someone who
5  has been deemed to be a perjurer during court proceedings
6  involving him and other individuals?
7  A    Yes, sir.
8  Q    Now, directing your attention to one of the factors that
9  you took into consideration helping you reach your belief that
10 Mr. Salemme would flee if released here has to do with the
11 incident that happened with Fitzgerald in 1968 or 1969.  I
12 apologize for the exact year, correct?
13 A    Yes.
14 Q    And you would agree with me as we've testified, you've
15 testified earlier that among others, beside Mr. Salemme, Flemmi
16 was indicted for that bombing as well, correct?
17 A    Yes.
18 Q    And the witness who put Mr. Flemmi and Mr. Salemme
19 involved in this incident was someone by the name of Dedico
20 (ph), fair to say?
21 A    Yes.
22 Q    And at some point, Dedico, maybe because Mr., Mr. Flemmi
23 was an informant at that time, but at some point Dedico
24 recanted his testimony that caused Steve Flemmi to be indicted
25 for this particular incident, the bombing of John Fitzgerald;

Cross - Doherty                                             50

1  is that fair to say?

2  A    I don't understand your question. Maybe because Mr. Flemmi

3  was an informant, that's what you said in the middle, so I, I'm

4  not sure--

5  Q    Okay, well strike the middle part.  At some point--

6  A    -- I'm not sure what you mean.

7  Q    -- Mr. Dedico was a witness who told people, told the

8  grand jury, told others that Mr. Flemmi was involved in the

9  bombings?

10 A    Yes.

11 Q    And at some point, Mr. Dedico recanted his testimony as

12 far as Stephen Flemmi was concerned?

13 A    Yes.

14 Q    And it was at that point that the indictments were

15 dismissed against Flemmi and he returns from Canada and he

16 returns to the Boston area?

17 A    Some time after that, yes.

18 Q    And, as we've also said, Mr. Salemme went to trial, was

19 found guilty, and given a state, a lengthy state prison

20 sentence, which he served, correct?

21 A    Yes.

22 Q    Isn't it true that Dedico eventually recanted his

23 testimony against Frank Salemme in connection with the bombing

24 of Attorney Fitzgerald?

25 A    Recanted his testimony that he gave at trial?

1  Q    Correct.

2  A    State trial?

3  Q    Correct.

4  A    I, I, I believe so. I've never read the testimony. I've
5  never spoke to Mr. Dedico, so I don't have the facts at hand.
6  But I am aware that Mr. Salemme plead guilty to the Fitzgerald
7  bombing and his involvement in the '95 indictment.

8  Q    Right. But he didn't plead guilty to the bombing itself
9  in 1973, when he went to trial?

10 A    When he went to trial?

11 Q    He went to trial.

12 A    Yes.

13 Q    And it was Dedico who testified at trial against
14 Mr. Salemme?

15         THE COURT: Just a moment. I'm, I'm a little confused
16 here. Mr. Salemme plead guilty to what?

17         THE WITNESS: In the, in his plea, that he plead
18 guilty to the, under the Wolf case, he plead guilty--

19         THE COURT: Oh, the Wolf case. I thought we were
20 talking about the bombing.

21         THE WITNESS: We were talking about the bombing.

22         THE COURT: Did you just--

23         THE WITNESS: That, that was charged in the, as a
24 racketeering, that was charged in the racketeering case.

25         THE COURT: Right, but I thought--

1         THE WITNESS:  In front of Wolf.

2         THE COURT:  -- we were specifically, just a moment, I

3   thought we, you were specifically responding to your question

4   about the bombing; is that correct?

5         MR. WEYMOUTH:  Excuse me.  I was asking about the

6   actual trial of the bombing, but I think what the agent is

7   saying is that when Mr. Salemme ended up pleading guilty before

8   Judge Wolf, one of the predicate offenses was the bombing and

9   that's what he pled guilty to.  I think that's what the agent

10  was saying.

11        THE WITNESS:  That's correct.

12        THE COURT:  Okay.

13  BY MR. WEYMOUTH:

14  Q    So, forgetting 1995 case, as far as the bombing case was

15  concerned, this wasn't a plea Mr. Salemme pled out, went to

16  trial.

17  A    Yes.

18  Q    And it was at trial that Mr. Dedico plea, testified

19  against Mr. Salemme?

20  A    Yes.

21  Q    And you testified that you heard at some point in the,

22  after that fact, and after he served his sentence, that

23  Mr. Dedico recanted the testimony that he gave against

24  Mr. Salemme?

25        MR. KELLY:  Your Honor, I want to object to the

1  relevance of this question.

2          THE COURT: You, you-

3          MR. KELLY: -- because he pled guilty to the Connolly
4  case.

5          THE COURT: I don't understand the question.

6          MR. WEYMOUTH: I'll rephrase the question.

7  BY MR. WEYMOUTH:

8  Q    Mr. Dedico testified against Frank Salemme at his state
9  court trial in Middlesex County in 1994 for the bombing of
10 Attorney Fitzgerald, correct?

11 A    No.

12 Q    '73?

13 A    He testified in the 1973 state trial, yes.

14 Q    And Mr. Salemme was found guilty?

15 A    Yes, he was.

16 Q    And at some point in the future after that incident
17 happened, Mr. Dedico recanted his testimony against Frank
18 Salemme?

19 A    I think he recanted portions of it. Again, I never spoke
20 to Mr. Dedico, and I haven't seen any of the 209's relating to
21 that. I have heard something like that.

22 Q    But you have heard that there was some recanting of some
23 testimony--

24         THE COURT: Will the witness just answer the question
25 and not go on and on because when you do that, it, it, you

1 confuse the issue for the Court. So just be sort of specific

2 if you can.

3 BY MR. WEYMOUTH:

4 Q   Do you know whether or not Dedico ever testified before

5 Congress in connection with his involvement in this case?

6 A   I don't know.

7 Q   Now, one of the items that you reviewed before testifying

8 here today and before preparing your affidavit had to do with a

9 DEA-6. Is this a department, a Drug Enforcement Agency form 6?

10 A   Yes.

11 Q   Statement by William St. Croix, is that fair to say?

12 A   Yes.

13 Q   And, you did, did you have anything to do with preparing

14 this particular statement initially when it was prepared?

15 A   I didn't read the report. I mean, I would have been

16 present during the briefings.

17 Q   But was this report brought to your attention in

18 connection with your preparation of this particular affidavit

19 that brings us here today at the detention hearing?

20 A   I, I mean, I would, I would have it, so the report was

21 within my office within the case.

22 Q   Exhibit No. 1, that's been introduced, are any of the

23 documents that you looked at to prepare that document and to

24 prepare you to testify today part of Exhibit 1?

25 A   Attached to Exhibit 1?

1  Q    Attached to Exhibit 1.

2  A    No, just the affidavit.

3  Q    Now, are you familiar with the DEA-6 involving the

4  interview of St. Croix?

5  A    I am.  I've read it before, yes.

6  Q    Do you, would, do you need me to show it you to refresh

7  your memory about what it says.  Do you remember what it says?

8  A    Roughly, yes.

9         MR. WEYMOUTH:  May I approach the witness please,

10 your Honor?

11        THE COURT:  You may.

12 BY MR. WEYMOUTH:

13 Q    Agent, I'm placing a document in front of you and ask you

14 to take a look at it and tell me if you recognize that, please.

15 A    Yes, I do.

16 Q    What do you recognize that to be?

17 A    It's one page out of a 48-page report, debriefing report

18 of William St. Croix.

19 Q    William St. Croix is the, one of the children of Stephen

20 Flemmi?

21 A    Yes, he is.

22 Q    And you testified that it's one of how many pages?

23 A    Forty-eight pages.

24 Q    But it's fair to say that you didn't review all 48 pages

25 in preparation of your affidavit and/or in preparation for your

Cross - Doherty                                                          56

1  testimony here today. Is that fair to say?
2  A.   That's fair to say.
3  Q.   And is it fair to say that you looked at one or two pages
4  of that total debriefing?
5  A.   That's accurate.
6  Q.   And the document you have in front of you, is that one of
7  the documents that you looked at in connection with your
8  debriefing of Mr. St. Croix?
9  A.   Yes, it is.
10          MR. WEYMOUTH:   May I approach the witness, please?
11          THE COURT:   You may.
12 BY MR. WEYMOUTH:
13 Q.   Now, your testimony today is, your testimony today is that
14 the main, one of the main witnesses in your case against
15 Mr. Salemme involving the incident of November the 2nd of 1999
16 is Stephen Flemmi; is that correct?
17 A.   Do you want to give me the dates again?
18 Q.   Sure. The allegations of this indictment are that false
19 statements were allegedly made on or about November 2nd of 1999
20 by Mr. Salemme, fair to say?
21 A.   Yes.
22 Q.   And--
23          MR. WEYMOUTH:   Excuse me a second, Judge.
24 BY MR. WEYMOUTH:
25 Q.   And this particular document, though it is a, a