1  debriefing, if you will, of Mr. St. Croix, it makes reference

2  to his father on many occasions during the body of that

3  document; is that fair to say?

4  A   Yes, it does.

5  Q   Okay. And it's talking about Mr. DiSarro, the gentleman

6  from the Channel Nightclub; is that correct?

7  A   That paragraph, yes, it does.

8  Q   Just one paragraph, paragraph 38, and as we talked about,

9  this is the one that you did look at in preparation of your

10 affidavit and your testimony, correct?

11 A   Yes.

12 Q   And it says here, can you, can you just from the middle

13 paragraph 38, starting on shortly after, can you read that to

14 us for the record, please?

15 A   The end of it, yes. "Shortly after DiSarro's

16 disappearance, but before it became public, Flemmi advised

17 St. Croix, you won't see him anymore."

18 Q   And him--

19 A   Well--

20 Q   -- I'm sorry, him in that case, there are a lot of

21 informal pronouns, him refers to DiSarro in that sentence?

22 A   Yes, it does.

23 Q   Can you continue please?

24 A   Flemmi further expounded on the subject by saying I,

25 Flemmi, had a big hand in his, DiSarro's disappearance.

1  St. Croix also noted that at some point during his, St.
2  Croix's involvement at the club, some type of licensing problem
3  cropped up. St. Croix stated that Salemme, Jr. appealed to
4  Flemmi, who in turn spoke to Bulger. Bulger then contacted,
5  Boston City Counselor Jimmy Kelly; however, St. Croix was
6  unsure as to whether Kelly was of any assistance on the matter.
7  Q    So, during this course of this debriefing, there's
8  indications here that Flemmi admits that he had a big hand in
9  DiSarro's disappearance, correct?
10 A    That's what that says, yes.
11 Q    And that he, Flemmi, said to his own son, you won't see
12 him, DiSarro, anymore; is that correct?
13 A    Yes.
14         MR. WEYMOUTH: Could I have the introduction of this
15 document, please?
16         THE COURT: Yes.
17         MR. KELLY: I think you should admit the whole thing,
18 your Honor.
19         MR. WEYMOUTH: I haven't seen the whole thing, Judge,
20 and there was not any indication he relied on the whole thing.
21         MR. KELLY: He received a two-paragraph excerpt. He
22 cherry picked two sentences in the excerpt. He should put in
23 the whole two-page excerpt.
24         THE COURT: I will allow--
25         MR. WEYMOUTH: That's fine, Judge, I thought--

1           THE COURT:  Pardon, counsel?

2           MR. WEYMOUTH:  I thought he was talking about the
3  whole 46 pages. I'll put those two pages in.  Those are the
4  only pages that I saw, paragraphs 37 and 38.

5           THE COURT:  Thanks.

6           THE CLERK:  Defendant's Exhibit A.

7      (Defendant's Exhibit A, admitted)

8           MR. WEYMOUTH:  No, that's the wrong page.  I'm
9  putting those on right now.  I'll get the other page.

10          THE COURT:  Counsel, will counsel approach?

11          THE CLERK:  Counsel, approach please.

12                          SIDEBAR CONFERENCE   (Off the Record)

13          THE COURT:  This matter will be continued to
14  11:00 a.m. tomorrow.

15          MR. KELLY:  Your Honor--

16          THE COURT:  Counsel?

17          MR. KELLY:  Your Honor, this is a matter for side
18  bar.

19                          SIDEBAR CONFERENCE (Off the Record)

20  (Court adjourned)

21  (Court called into session)

22          THE CLERK:  Continuance of U.S.A. v. Frank Salemme.

23          THE COURT:  It's the Court's understanding that the
24  parties reached agreement for a continuance in this matter in
25  that the government, defendant's counsel is called for trial

1  tomorrow and the government witness will not be available

2  tomorrow. So what is the date and the time?

3        MR. WEYMOUTH: We're asking for 2:00 p.m., December

4  7th. It's a Tuesday, Judge, next Tuesday, a week from tomorrow.

5        THE COURT: Okay.

6        MR. WEYMOUTH: Judge, once again, to the extent that

7  it's possible, since I do need to consult with my client, I'd

8  ask you to order the marshal to make Mr. Salemme accessible to

9  me over the next six or seven days?

10        MR. KELLY: Could I just confer with the marshals on

11  that, your Honor?

12        THE COURT: Sure.

13    (Defendant sworn)

14        THE CLERK: Please, state your name and spell your

15  last name for the record.

16        THE DEFENDANT: S-A-L-E-M-M-E.

17        THE COURT: Mr. Salemme, do you agree to December 7th

18  at 2:00 p.m. for a continuance of your detention hearing.

19        THE DEFENDANT: Yes, your Honor.

20        THE COURT: All right. You may be seated.

21        THE DEFENDANT: You may be seated.

22  (Pause)

23        MR. KELLY: Your Honor, if we could just have some

24  flexibility as to where he's held over the next seven days,

25  we'll make every effort to have defense counsel to have access

1  to him prior to the continuance of this hearing. I can't just

2  stand here and say he can definitely be locally here or where

3  he is now for the next seven days. They're aware they have to

4  make every effort to have defense counsel have access to him.

5              THE COURT: Let me state for the marshal service that

6  defense counsel needs access. To the extent possible, would

7  you, please, ensure that defense counsel has access to the

8  defendant?

9              THE MARSHAL: Yes, your Honor.

10             THE COURT: Thank you. Anything further?

11             MR. WEYMOUTH: No, your Honor.

12 (Court adjourned)

13 //

14 //

15 //

16 //

17 //

18 //

19 //

20 //

21 //

22 //

23 //

24 //

25 //

CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____          February 16, 2005
Maryann V. Young


**Maryann V. Young**
**Certified Court Transcriber**
**(508) 384-2003**

EXH 4
COPY

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Docket No. 04-10323-RGS

**UNITED STATES OF AMERICA**
    Plaintiff

    v.

**FRANCIS SALEMME**
    Defendant

. . . . . . . . . . . . . .

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE JOYCE LONDON ALEXANDER
UNITED STATES MAGISTRATE JUDGE
HELD ON
DECEMBER 7, 2004

APPEARANCES:

For the government: Brian T. Kelly, Esquire, Fred Wyshak, Jr., Esquire, United States Attorney's Office, John Joseph Moakley Federal Courthouse, 1 Courthouse Way, Suite 9200, Boston, MA 02210, 617-748-3197.


For the defendant, Francis Salemme: Stephen J. Weymouth, Esquire, Law Office of Stephen J. Weymouth, Suite 3, 65a Atlantic Ave, Boston, MA 02110, 617-573-9598.



Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

---

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

2

| | WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|---|
| | Daniel Doherty | | 6 | 20 | 26 |

INDEX

| EXHIBITS | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| Government's | | |
| 2 | Frank Salemme's Plea Agreement | 26 |
| 3 | Fourth Superseding Indictment | 26 |

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

3

1  P R O C E E D I N G S

2  (Court called into session)

3         THE CLERK: United States v. Francis Salemme,

4  Criminal Case No. 04-10323.

5         Attorney Weymouth, Kelly, come forward, please.

6         MR. KELLY: Yes.

7         SIDEBAR CONFERENCE

8         THE COURT: Okay. This--

9         MR. KELLY: Judge--

10        THE COURT: No, no wait. Let me put this on the

11 record. How much time do we think we're going to take with

12 this, because I have another at three. One of, one of the

13 things that I want to say on the record is that this is a

14 detention hearing and probable cause has been established by

15 the grand jury. Counsel has inquired of the witness with

16 regard to the weight of the, of the evidence, but

17 notwithstanding the weight, there still is probable cause. I'd

18 like you to spend time focusing on the issue of the second

19 prong which is whether or not there's a condition or a

20 combination of conditions to reasonably assure the appearance

21 and the safety of the community.

22        So, given that, let's try not to go over any

23 territory that we've done on the previous day.

24        MR. WEYMOUTH: Judge, I have, I just want to make a

25 comment then?

*Maryann V. Young*
Certified Court Transcriber
(508) 384-2003

4

1       THE COURT: Yes.

2       MR. WEYMOUTH: Quite frankly, I'm not sure there's a
3  whole lot of cross examination that I can get through Agent
4  Doherty about that second prong. My request at the end of the
5  testimony today, I felt that - (inaudible #3:22:07) -- the
6  witnesses, was I was going to ask, ask for the opportunity to
7  come back maybe tomorrow to submit some conditions from myself
8  under seal about the terms and conditions that I think might be
9  appropriate for me to rely on, that I may oversee--

10      THE COURT: Okay.

11      MR. WEYMOUTH: -- to ensure his presence here.

12      THE COURT: We don't have to come back to do that,
13 you don't need to come back to do that. You're just going to
14 ask to submit--

15      MR. WEYMOUTH: In writing, under seal.

16      THE COURT: Right. Uh-huh.

17      MR. WEYMOUTH: -- based on my honor. I briefly
18 mentioned it to Mr. Kelly--

19      THE COURT: That's fine.

20      MR. WEYMOUTH: -- that's what I am doing. I don't
21 really want to run afoul with the Court's prohibition as far as
22 cross examination, but frankly, a lot of what I was planning to
23 cover this afternoon is not necessarily on what terms or the
24 conditions because, quite frankly, this, this agent could not
25 give me any those. He doesn't have any. He agrees and

*Maryann V. Young*
**Certified Court Transcriber**
**(508) 384-2003**

5

1  believes that there are none.
2          THE COURT: Right.
3          MR. WEYMOUTH: Basically, my evidence would be just
4  sort of submitted under seal for me, and that may suggest, and
5  in fact, we can talk to pretrial about it, and it's something
6  perhaps pretrial can flesh out a little bit, and present to the
7  Court, present to Mr. Wayshack and Mr. Kelly.
8          THE COURT: Go ahead. And then if the Court needs,
9  we'll call in both parties, and if there are any issues with
10 regard to what has been submitted, the Court will call counsel
11 back in, but I didn't want to repeat any of the cross
12 examination that has already taken place.
13         MR. KELLY: We have no, no further testimony or
14 witnesses to present.
15         THE CLERK: Today's date is November, December 7,
16 2004. This is the case of United States vs. Frances Salemme,
17 Criminal Case No. 04-10323. Will the attorneys please identify
18 themselves for the record?
19         MR. KELLY: Yes, good afternoon, your Honor. Brian
20 Kelly and Fred Wyshak for the United States.
21         MR. WEYMOUTH: Good afternoon, your Honor--
22         THE COURT: Good afternoon.
23         MR. WEYMOUTH: -- Stephen Weymouth for Mr. Salemme.
24         THE COURT: You may proceed.
25         (Government witness, Daniel Doherty, sworn)

6

```
 1            THE CLERK:  State your name and spell your last name
 2   for the record.
 3            THE WITNESS:  Daniel Doherty.  D-O-H-E-R-T-Y.
 4            MR. KELLY:  May I proceed, your Honor.
 5            THE COURT:  You may.
 6                         CROSS EXAMINATION
 7   BY MR. WEYMOUTH:
 8   Q    Good afternoon, agent.
 9   A    Good afternoon.
10   Q    Last time we were here on Monday, November the 29th, and
11   you were testifying about the experience you had not only as a
12   DEA agent and others, but your experience with Mr. Salemme and
13   the prosecution and investigation of Mr. Salemme over the past
14   fifteen years, correct?
15   A    I don't believe it was fifteen years, but--
16   Q    Some period of time?
17   A    Yes.
18   Q    And were you involved in the grand jury investigation that
19   resulted in the return of this present indictment that brings
20   us here today?
21   A    Yes, I was.
22   Q    And when you learned, or when you were aware that the
23   grand jury was considering to vote whether or not to return an
24   indictment, were you aware of where Frank Salemme was?
25   A    No, I was not.
```

7

1  Q    Were you aware that Frank Salemme was in the program at
2  the time?
3  A    Yes, I was.
4  Q    And you know what I mean when I say the program, correct?
5  A    The witness protection program.
6  Q    Witness security program, is that correct?
7  A    Yes.
8  Q    Now, did you do any checking about Mr. Salemme's
9  incarceration, for example, at the end of his sentence that was
10 given by Judge Wolf some time in 1999? For example, did you
11 find out when he finished that sentence?
12 A    When he actually got out?
13 Q    Yes.
14 A    Several months after his Rule 35 hearing in front of Judge
15 Wolf.
16 Q    And were you asked, did anyone ask you to conduct any sort
17 of investigation after the indictment had been returned about
18 what Mr. Salemme had been doing since his release from prison
19 until October or November of 2004 when the indictment was in
20 hand?
21 A    No.
22 Q    So you're not aware of the fact that while in the program
23 he had been in compliance with the rules and regulations of the
24 program?
25 A    No, I didn't do any investigation.

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

1  Q    None whatsoever?

2  A    Regarding that, no.

3  Q    So the investigation about Frank Salemme and his risk of

4  flight that you relied on to reach your belief about whether or

5  not he was going, Mr. Flemmi would be a, Mr. Salemme would be

6  risk of flight, was based on your investigation of and your

7  knowledge of Mr. Salemme back in 1968 and back in 1995, the two

8  times he did in fact flee?

9  A    Primarily, yes.

10 Q    So, but you have no information about what Mr. Salemme has

11 been up to since his release from prison in 2003?

12 A    I know he was back and it was on the news, he was back in

13 the Boston area for a period of time.

14 Q    You knew that he was in the program before that period of

15 time?

16 A    I was aware of that, yes.

17 Q    And you knew that he returned to the program after that

18 period of time that he was back in Boston?

19 A    I am aware of that now.

20 Q    Did you effectuate or did you participate in the arrest of

21 Frank Salemme in connection with this indictment?

22 A    No.

23 Q    Do you know where he was arrested?

24 A    Virginia, I believe.

25 Q    Okay. And did you know whether or not he was arrested in

1  the company of marshals?

2  A    I know the marshals arrested him.

3  Q    But there were marshals with him as handlers while he was

4  there in Virginia at this particular time, isn't that fair to

5  say?

6  A    I'm not aware of that, no.

7  Q    So basically, you didn't spend any time because you didn't

8  what he had done in the last fifteen months.  All you cared

9  about was what he had done in 1968 and 1995 as far as flight

10 was concerned.  Is that a fair statement?

11 A    No, that would be inaccurate.

12 Q    Okay, then you tell me what a fair statement is.

13 A    You indicated that I didn't care.  It's not, when

14 someone's in the witness protection program, there's no

15 information given out, even to agencies within the government,

16 and it's a, a closed program within the marshals service, so if

17 we were querying, you know, where he was, what he was doing,

18 that, that's not proper procedure, and that information

19 wouldn't be given out, I don't believe.

20 Q    Somehow you got that information about where he was when

21 he got arrested in the program, right?

22 A    After the fact, after he was arrested?

23 Q    I don't know, when did you find out?

24 A    After he was arrested where he was.

25 Q    And you knew then at that point that he was in the program

1  and where he'd been arrested?

2  A    Yes, within the day of his arrest, yes.

3  Q    And it's clear, is it not, that when a judge or some

4  entity is making a determination about whether or not someone

5  is a risk of flight or a danger, one of the factors taken into

6  consideration is past track record, fair statement?

7  A    Yes.

8  Q    So, someone has a tendency and history of running, then

9  the assumption, the inference is is that at the present time,

10 he or she may run?

11 A    That's a good inference, yes.

12 Q    And if someone is a danger in the past, the inference

13 would be that he or she is a danger in the future?

14 A    That's also something I believe the judge takes into

15 consideration.

16 Q    And what you've presented to the Judge today and Monday,

17 of, November 29th, is information about Frank Salemme in 1968

18 and in 1995 about the risk of flight?

19 A    On the risk of flight, yes.

20 Q    You've given the Judge no information about what, if

21 anything, Mr. Salemme has done since he left prison in March of

22 2003 until his arrest in October of 2004?

23 A    I don't believe I've been asked that question.

24 Q    Did you do anything to learn what Mr. Salemme has done

25 since March of '03 until October of '04?

1  A.   Did I look into, I mean, besides reading the papers and
2  watching the news--
3  Q    I don't care about the papers.  I don't care about the
4  news.
5  A    When he was back in Boston?
6  Q    -- what did you do in your official capacity as an agent
7  of the government to determine what Frank Salemme's behavior
8  had been like from March of '03 until he was arrested in
9  November or October of '04?
10 A    Again, Mr. Weymouth, I did not contact the marshal's and
11 ask, you know, how he was in the program.  I, I do understand
12 that if he, you know, came back to the danger area, which would
13 be Boston, he would have left the program.  He would have been
14 automatically terminated out of the program at that point in
15 time.
16 Q    You know--
17 A    And then at some subsequent point in time, obviously he
18 was reentered into the program.
19 Q    Where did you get your information that he was
20 automatically terminated from the program when he returned to
21 Boston?
22 A    I believe that's, you know, that's basic 101.  If you, you
23 know, you come back to the danger area, you're in the program.
24 You come back to the danger area, I mean, he was on Channel 5
25 News, I believe.  I believe he would have been out of the

1  program at that point in time.
2  Q  Once again--
3  A  And you also indicated that he was put back in the
4  program, so.
5  Q  Okay, and but, so you knew that you had the opportunity to
6  conduct an investigation about what had been going on with
7  Mr. Salemme in an attempt to update your information about his
8  present risk of flight in 2003 to 2004?
9  A  Are you talking about the months he was in Boston?
10 Q  I'm talking about from March '03 until October of '04. He
11 wasn't in Boston that whole time, that's the period we're
12 talking, March of '03 to October of '04.
13 A  Again, I really don't understand your question. The
14 bottom line is yes, he was in the program initially when he was
15 released from prison. He was going for many months. I know he
16 came back into the Boston area. He was back in the Boston area
17 for several months, and it's my understanding that he had gone
18 back into the program prior to his arrest on this case.
19 Q  Again, what evidence do you have that--
20     MR. KELLY: Objection. Asked and answered.
21     THE COURT: Sustained.
22 BY MR. WEYMOUTH:
23 Q  What evidence do you have about Mr. Salemme's present
24 dangerousness?
25 A  Basically, Mr. Salemme's life, his whole adult life he's