1  been involved in criminal activities, except the times he's
2  been involved in, you know, he was incarcerated.
3  Q    And have you determined in your own investigation, if
4  you've done one, from '03 to '04, whether or not the government
5  has any evidence that Frank Salemme has engaged in any criminal
6  activity during that period of time?
7  A    I'm not aware of any.
8  Q    Do you know of anyone in your agency or anyone on your
9  team that's aware of any allegations that Frank Salemme has
10 committed any criminal offenses or engaged in violent
11 activities from March of '03 to the present time?
12 A    Again, I'm not, I'm not aware of any.
13 Q    Now, did you bring a copy of your affidavit, Exhibit No.
14 1?
15 A    Yes, I did.
16 Q    Can I ask, can I direct your attention, please, to the end
17 of the beginning paragraph on page six, the paragraph that
18 begins on page five.
19         MR. KELLY:  I'm sorry, which page?
20         MR. WEYMOUTH:  Five to six.
21 BY MR. WEYMOUTH:
22 Q    Did you have a chance to find that paragraph?
23 A    Yes, I found it.
24 Q    Now, your testimony is is that because of the past, it's
25 your opinion that today if released and not detained, that

1  Mr. Salemme would flee, correct?
2  A    I think there's an excellent chance, yes.
3  Q    And in your paragraph that I referred to in your
4  affidavit, the last two sentences, "based on Salemme's ability
5  to utilize his own prior fugitive experience", do you see where
6  I'm saying?
7  A    Yes.
8  Q    Now, as an agent of the government, have you investigated
9  or have you learned for your own information to make yourself a
10 better agent, what it takes for someone who is fleeing an
11 indictment or fleeing a criminal charge to survive on the run?
12 A    I, I'm aware of several things, yes.
13 Q    And can you tell us what those several things are that
14 you're aware of that one might need to have in order to
15 successfully run away from a criminal prosecution?
16 A    Money, sometimes, you know, not necessarily large sums,
17 but money; identity, new identity or different identity than
18 your known identity; individuals that will assist you, you
19 know, while you're out on the run.
20 Q    Anything else that you can think of?
21 A    Primarily with those three, you, you could be successful.
22 Q    And that was what you were referring to when you talked
23 about the ability to utilize his own prior fugitive experience?
24 A    Yes. He was a fugitive on two occasions in his past.
25 One--

1  Q    Right, 1968 and 1995.

2         MR. KELLY:  Judge, let the agent just finished his

3  answer.

4  A    One for an extended period of time, yes, sir.

5  BY MR. WEYMOUTH:

6  Q    And during those periods of times, of the three things you

7  were talking about, he would need a sum of money to survive,

8  correct?

9  A    Anybody would, yes.

10 Q    He, or anyone would need a, perhaps a different identity

11 to survive?

12 A    It would be very helpful, yes.

13 Q    He or someone would need the assistance of other

14 individuals to help him?

15 A    I think, yes.

16 Q    And, it's fair to say, strike.

17      Do you think it's fair to say that in 1968 and 1995, that

18 while he was on the run, Mr. Salemme had some assistance from

19 members of his organization, the Mob, the LCN, whatever you

20 want to call it, helping him on his flight?

21 A    As, as well as others, friends he's known, you know,

22 throughout his lifetime, I'm sure, he, he could have called

23 upon and may have.

24 Q    And other people involved in criminal activities along

25 with him in '68 and '95, is that fair to say?

1  A    Yes.

2  Q    And he would have had money during those periods of times

3  in order to support himself and survive while on the run?

4  A    Yes.

5  Q    And you agree with me that in 1999 and in 2002,

6  Mr. Salemme cooperated with the government in connection with a

7  prosecution, perhaps two prosecutions in this district, fair to

8  say?

9  A    I, I don't know what you mean by two prosecutions and the

10 different timeframe, in 1999.  You're talking the Connolly

11 case, and then when it went to trial, which was one

12 investigation.

13 Q    And he cooperated against Stephen Flemmi as well.

14 A    He provided information, I mean he wasn't part of the case

15 against Stephen Flemmi.

16 Q    He provided information against Stephen Flemmi, correct?

17 A    In his report, yes.

18 Q    And as a member, and in fact, under your affidavit, as the

19 father, if you would, of the LCN during particular periods of

20 time, do you think his fellow gangsters, his fellow organized

21 crime members are happy that Frank cooperated with the

22 government?

23 A    All of them, I would say, no.

24 Q    And do you think there's the possibility that some of them

25 may want to do harm to Frank Salemme?

1  A    Some may, some may want to help him.

2  Q    Do you know anyone that you yourself have found out,
3  either said something to you or something to one of the
4  informants or whatever you've developed that they're willing to
5  help Frank Salemme. Has anyone said that to you?

6  A    No one has said that.

7  Q    And wouldn't it be fair to say that the people that he
8  mentioned, even didn't testify against but mentioned in
9  briefings and proffers would not be very willing to help Frank
10 Salemme because of this cooperation with the government?

11 A    I think that would be inaccurate. I mean, he mentioned
12 his brother Jackie, although briefly, and I'm sure his brother,
13 who is a member of LCN, would certainly help Mr. Salemme.

14 Q    You're certain about that?

15 A    I believe he would, yes.

16 Q    Anyone, anyone ever told you that?

17 A    No, I believe he would though.

18 Q    So, while you were investigating Frank Salemme or whatever
19 you were doing in connection with this investigation, did you
20 uncover large amounts, or some amounts of money that Frank
21 Salemme has stashed away somewhere?

22 A    I did not, no.

23 Q    Have you discovered the location or evidence that
24 Mr. Salemme owns real estate somewhere in this country or in
25 the world?

1  A     I, I'm not aware of any, no.

2  Q     Are you aware of any, you yourself, of any assets that
3  Mr. Salemme might have hidden away or have available to him,
4  that you're aware of, that might assist him in any risk of
5  flight that you think he's going to engage in?

6  A     Again, I'm not aware of any.

7  Q     Now, if you had done some investigation of what was going
8  on in Mr. Salemme's life from '03 to '04, would you have
9  learned, might you have learned the fact that he was in total
10 compliance, not only with the program, but with the terms and
11 conditions as a special release set by Judge Wolf?

12 A     Again, I don't know how to answer that.  I think I've
13 answered it before.  Obviously, he violated the program at some
14 point in time, because he was out of the program, so--

15 Q     Well, if he told his handler and asked permission to leave
16 the program, and voluntarily terminated himself from the
17 program, that doesn't mean he was kicked out, does it?

18 A     No, not necessarily.  He could have voluntarily left.

19 Q     And you know that the program in fact is totally
20 voluntarily?

21 A     That's correct.

22 Q     Someone can voluntarily go into the program, and someone
23 can voluntarily leave the program, correct?

24 A     That's correct.

25 Q     And someone can in fact, voluntarily go back into the

1  program; isn't that correct?

2  A    On occasions, yes.

3  Q    And you know, under OEO regulations, that even at this

4  point in time, that if a sponsor, you know what a sponsor is?

5  A    Yes, I do.

6  Q    If a sponsor, or Frank's sponsor writes a letter to OEO,

7  asking for reinstatement, that that's an application, a request

8  that OEO would consider?

9  A    Again, yes I'm aware of that.

10 Q    So, there's nothing that Frank Salemme has done, other

11 than being arrested and charged by the government, with being

12 thrown out of the Witness Security Program?

13 A    Again, I don't know whether he voluntarily left, or he was

14 terminated because, I, I don't know the answer to that.  I

15 don't have that information.

16 Q    Don't you think that might have been helpful for a

17 determination of this Court by this Court, about the present

18 status of Frank's ability to face his indictment, to run,

19 comply with terms and conditions.  Wouldn't have that been

20 important information to learn as a government investigator?

21          MR. KELLY:  Objection, argumentative.

22          THE COURT:  Sustained.

23 BY MR. WEYMOUTH:

24 Q    You didn't take any steps to learn whether or not he was

25 in compliance with his special terms and conditions of pre,

1  special release?

2          THE COURT: Asked and answered.

3          MR. KELLY: Asked and answered.

4          MR. WEYMOUTH: I didn't just--

5          THE COURT: Asked and answered. Sustained.

6  BY MR. WEYMOUTH:

7  Q    So you have no information to provide to us today about

8  present information concerning Frank Salemme?

9          MR. KELLY: I object, your Honor.

10         MR. WEYMOUTH: I have nothing further.

11                     REDIRECT EXAMINATION

12 BY MR. KELLY:

13 Q    Briefly, Agent Doherty, special counsel harps on the

14 timeframe of March '03--

15         MR. WEYMOUTH: Objection to the word harp.

16 Q    -- through October '04 a moment ago. Do you recall that

17 series of questions?

18 A    Yes, I do.

19 Q    Are you aware that a significant difference between now

20 and that time period is that now he's facing federal charges

21 that could send him to jail for the rest of his life?

22 A    Yes, I am.

23 Q    And in your view, does that change the calculus as to

24 whether he's a flight risk?

25 A    Absolutely.

1  Q    There was a few questions today, and several questions at
2  the last hearing where defense counsel suggested that Salemme
3  was able to flee twice before successfully because he had
4  friends on the street and the Mafia who could help him. Do you
5  recall those questions?
6  A    Yes, I do.
7  Q    Who's Jackie Salemme?
8  A    His brother.
9         MR. WEYMOUTH:  Objection, asked and answered.
10 Q    And what's Jackie Salemme's--
11        MR. WEYMOUTH:  Asked and answered.
12        THE COURT:  This is cross counsel.  Overruled.
13 BY MR. KELLY:
14 Q    And what's Jackie Salemme's status in the community?
15 A    He's a member of the LCN.
16 Q    And, is he still on the street?
17 A    Yes, he is.
18 Q    Available to help his brother?
19 A    Yes, he is.
20 Q    In fact, in your affidavit, do you in fact note that
21 Jackie Salemme has in the past violated court orders?
22 A    Yes, I did.
23 Q    And, remember all those questions at the last hearing
24 wherein defense counsel suggested that the state conviction
25 after a trial of, was somehow invalid because one of the

1  witnesses didn't testify truthfully, and that the case would

2  involve the assault with intent to kill of Attorney Fitzgerald.

3  Do you remember those questions?

4         MR. WEYMOUTH: Objection, your Honor. That's a

5  misstatement of the question.

6         THE COURT: Overruled, you may answer.

7  A   Yes, I remember it, your Honor.

8  BY MR. KELLY:

9  Q   All right, do you, let me show you quickly Exhibit is 2

10 and 3, Government's Exhibits 2 and 3, which I've already shown

11 the defense counsel. Showing you Exhibit 2, what, what is

12 that? I've highlighted the front page.

13        MR. WEYMOUTH: Judge, I, I don't know what we're

14 looking at here. I didn't, I was thrown a copy of these two

15 documents when I came at five minutes to three. I--

16        THE COURT: Would you, counsel--

17        MR. WEYMOUTH: I didn't realize they'd been

18 introduced--

19        THE COURT: -- counsel, calm down.

20        MR. WEYMOUTH: They, they haven't been introduced.

21        THE COURT: Would you give counsel a copy of the

22 exhibit?

23        MR. KELLY: I did, your Honor.

24        THE COURT: Okay.

25        MR. WEYMOUTH: He gave them to me five minutes ago.

1             MR. KELLY:  I didn't throw them at him.  It's the
2  plea agreement from '99 and the indictment to which he pled
3  guilty.  This is to 2, Exhibit 3.
4  BY MR. KELLY:
5  Q    Now, with reference to Exhibit 2, Agent Doherty, what is
6  it?
7  A    It's, it's defendant Frank Salemme's plea agreement, plea
8  agreement, Criminal No. 94-10287-MLW.
9  Q    The so-called Judge Wolf case?
10 A    That's correct.
11 Q    And on the face of the plea agreement, does it, in the
12 second, in the first paragraph, talk about what he's going to
13 plead guilty to?
14 A    Yes.  It indicates that the defendant shall plead guilty
15 to all counts of the indictment pending in the above-cited
16 criminal number.
17 Q    Okay.  And in fact, does it indicate that he's going to
18 plead guilty to the RICO counts with various predicate acts?
19 A    Yes, it does.
20 Q    And is there a predicate acted listed as number 20?
21 A    Yes.
22 Q    All right.  Now showing you Government's Exhibit 3, what's
23 that?
24 A    That is the fourth superceding indictment in the same—
25            THE COURT:  Counsel--

1       THE WITNESS: -- case.
2       THE COURT: -- we do not have a copy of Exhibit 3.
3       MR. KELLY: Your Honor, I'm trying to introduce it
4  now if you, would the Court like a copy as well?
5       THE COURT: Are all of the, your Exhibits pre-marked?
6       MR. KELLY: This is Exhibit 3. This is Exhibit 2.
7       THE CLERK: Government's Exhibit 2.
8       THE COURT: No, that one, no. Thank you.
9  BY MR. KELLY:
10 Q   All right, so on where, on the Government's Exhibit 2, on
11 the page list, it's referring that the defendant pled guilty to
12 all counts of the indictment. Is Exhibit 3 the indictment that
13 it references?
14 A   Yes, it is. The fourth superseding indictment in that
15 case.
16 Q   All right, and on the face page of Exhibit 2 where it
17 talks while he's pleading guilty to Count 1 and various
18 racketeering acts, predicate acts, it mentions Number 20,
19 right?
20 A   That's correct.
21 Q   And when you look at Government's Exhibit 3, specifically,
22 the bottom of page 31, is that racketeering Act 1?
23 A   Yes, racketeering, Act 20A, yes.
24 Q   And on the next page, is it 20B?
25 A   Yes, it is.

1  Q    And that's one of the things Mr. Salemme pled guilty to
2  in 1999, correct?
3  A    Yes, it is.
4  Q    In fact, of those racketeering acts that he pled guilty
5  to, is that, does January 30, 1968, is that the bombing with
6  the intent to kill Attorney Fitzgerald?
7  A    Yes, it is.
8  Q    So whether or not the state conviction is valid on some
9  witness' false testimony, in fact, he pled guilty to the same
10 conduct in 1999, correct?
11 A    Yes, he did.
12      MR. KELLY:   The Government will move Exhibit's 2 and
13 3 into evidence, please.
14      THE CLERK:   Exhibits 2, and Exhibits 3, marked and
15 admitted.
16      (Government Exhibit Nos. 2 and 3, admitted)
17 BY MR. KELLY:
18 Q    Now, just two more items.  Remember how defense counsel
19 suggested that this current prosecution of Mr. Salemme was
20 somehow vindictive because his sentence had been reduced by
21 more, by Judge Wolf, by more than what the government had
22 requested; do you remember that line of questioning?
23 A    Yes.
24 Q    Can you tell us, in fact, what restarted this
25 investigation into the DiSarro's murder, that Mr. Salemme is

1  now charged with lying about.

2  A   · Based on new information we received from an eyewitness at

3  the murder, that restarted the investigation.

4  Q   And was this new evidence that came to the government many

5  months after Mr. Salemme had been re-sentenced?

6  A   Yes, it did.

7  Q   And is that in fact what triggered the new investigation,

8  which led to the indictment in this case?

9  A   Yes.

10 Q   Finally, defense counsel referred repeatedly to the

11 horrendous criminal conduct of Stephen Flemmi, one of the

12 witnesses in this case.  Do you recall those questions?

13 A   Yes.

14 Q   Now, who was Mr. Flemmi's criminal partner for many years?

15 A   For many years it was Mr. Francis Salemme.

16 Q   And as result of your efforts and the state police, what

17 is Mr. Flemmi doing now?

18 A   Mr. Flemmi is serving a life sentence without parole.

19          MR. KELLY:  Nothing further, your Honor.

20          THE COURT:  Recross?

21                    RECROSS EXAMINATION

22 BY. MR. WEYMOUTH:

23 Q   Your testimony was that Mr. Salemme faces a life sentence,

24 is that true?

25 A   · Mr. Flemmi faces--

1  Q    Mr. Salemme, based on a question asked of you by the
2  prosecutor, what he said to you was, Mr. Salemme faces a life
3  sentence at the present time, correct?
4           MR. KELLY:  I believe my question, your Honor, to be
5  accurate, was essentially facing a life sentence given his age.
6           THE COURT:  Life sentence.
7  BY MR. WEYMOUTH:
8  Q    He's not facing, essentially or otherwise, a life sentence
9  in connection with indictment, is he?
10 A    He could be facing a life sentence based on, you know, a
11 ten-year period of incarceration.
12 Q    The guidelines call for a hundred, up to a hundred and
13 twenty months, correct?
14 A    That's correct.
15 Q    You're calling it a life sentence because of the age of
16 Mr. Salemme?
17 A    I'm not calling it a life sentence.  I say it could be a
18 life sentence.
19 Q    But, but it's not a life sentence?
20 A    No, not a life sentence.
21 Q    Correct.  And the eyewitness that, that generated this new
22 investigation, is that Stephen Flemmi?
23 A    That's correct.
24 Q    And, in fact, the debriefing of Mr. Flemmi began back in
25 the fall of 2003, over a year ago; is that correct?

1  A  Yes.

2  Q  Nothing further.

3      THE COURT: You may stand down.

4      THE WITNESS: Thank you.

5      (Witness excused)

6      THE COURT: Attorney Weymouth, do you have any other

7  witnesses or evidence to present?

8      MR. WEYMOUTH: I do not have any witnesses to

9  present, your Honor. I had mentioned to you the possibility of

10 submitting--

11     THE COURT: Yes.

12     MR. WEYMOUTH: -- things under seal, but not today.

13     THE COURT: Does the government have any evidence or

14 witnesses to present?

15     MR. KELLY: No, your Honor. We have a, another copy

16 of our original motion for detention but, and the affidavit

17 filed, but the Court here has a copy, that's another copy of

18 our original motion in which we argue our position that he

19 should be detained.

20     THE COURT: Okay. I'll hear from the government.

21     MR. KELLY: Yes, your Honor. The government has

22 indicated in its written motion it believes Mr. Salemme should

23 be detained for two reasons. First, he should be detained

24 because he's a risk of flight. Second, because he's a danger

25 to the community. As the Court well knows and is well

1  established by First Circuit law, the risk of flight analysis
2  is determined only by preponderance of the evidence as
3  standard.  And what we have here is a defendant with a proven
4  track record of becoming a fugitive when faced with serious
5  charges.  He's done it not once, but twice before in the past.
6  That strongly suggests that he will in fact become a fugitive
7  in this case, because in the government's view, he's, he's
8  facing what could be tantamount to a life sentence.  He's
9  seventy-one years old.  He's facing a sentence in the guideline
10 region of ten years.  Thus, we believe there is a very strong
11 possibility, far more than preponderance of the evidence that
12 given his track record, he'll flee again.  He knows how to do
13 it.  His brother's, as, as you've just heard is a member of the
14 LCN.  He has, he still has many friends and family on the
15 street who could help him.  We believe there's a clear and
16 strong risk that he will flee, and the Court can decide this
17 detention issue on that grounds alone.  Even if the court were
18 to consider dangerousness, the Court should also find that he
19 is a danger to the community given his life long career of
20 crime, including as you've heard in the last occasion and in
21 the current affidavit, these crimes included murder.  Crimes
22 that are as serious as they can be.  The defendant in fact has
23 violated court orders in the past as you've heard from the
24 prior testimony and as set forth in the affidavit.  He violated
25 a court order while incarcerated in the case pending before