UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) | Cr. No. 04-10323-RGS |
| FRANCIS P. SALEMME, | ) ) | |
| Defendant. | ) ) | |

GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT'S
PRETRIAL MOTIONS

Defendant Salemme has filed numerous pretrial motions including:(a) a motion to suppress the defendant's statements made pursuant to a proffer agreement; (b) a motion to dismiss the indictment; (c) a motion to recuse the prosecutors in this case; and (d) a motion for discovery. For the reasons set forth below, the government submits that these motions are without merit and should be denied.

I.   FACTUAL BACKGROUND

The defendant was indicted for racketeering and various other offenses in January 1995 (hereinafter the "Salemme case"). (See United States v. Francis P. Salemme, et al., Cr. No.94-10287-MLW.)  The defendant fled the jurisdiction, was apprehended in Florida in August 1995, and was detained pending trial.

In approximately January 1997, hearings commenced on numerous substantive motions in the Salemme case.  These hearings led to an evidentiary hearing in 1998 which addressed the relationship between two of the defendants in the Salemme case, James Bulger and Stephen Flemmi, and the Federal Bureau of Investigation (FBI).  The results of this hearing are documented in a district court decision, United States v. Salemme, 91 F.Supp.2d 141 (D.Mass. 1999), rev'd in part, United States v. Flemmi, 225 F.3d 78 (1st Cir. 2000).  The district court decision was issued in

October 1999, and provided little or no relief for any defendant except Flemmi.

Shortly after the issuance of the October 1999 opinion, the defendant (through his counsel) began to make overtures to the Salemme case prosecutors to the effect that the defendant could be helpful in a prosecution of an FBI agent who was at the center of the 1998 hearings, John Connolly. By that time, Attorney General Janet Reno had created the "Justice Task Force" led by Special AUSA John Durham from Connecticut and composed of federal agents and prosecutors assigned to investigate FBI corruption in Boston. Defendant's counsel subsequently communicated with SAUSA Durham, and the defendant and his counsel executed a standard U.S. Attorney's Office proffer letter which contained the usual exception that defendant's statements **could** be used against him "in a prosecution of Mr. Salemme based on false statements made or false information provided during the proffer."

In addition to making a proffer to SAUSA Durham regarding Connolly,[1] the defendant chose to make a proffer regarding his post-1988 conduct[2] in an attempt to earn a substantial assistance departure (U.S.S.G. §5K1.1) on his pending racketeering case. This second proffer was necessary for a variety of reasons and was the subject of numerous conversations with defendant's counsel prior to November 2, 1999.

First and foremost among the reasons for the second proffer was the fact that the defendant sought a plea agreement with a substantial assistance provision on his pending racketeering case.

---

[1] This initial proffer was made telephonically while defendant was incarcerated and being held in Plymouth County Correctional Facility.

[2] The defendant had been incarcerated from approximately 1972 through 1988. Upon his release, he was inducted into the Patriarca Family of La Cosa Nostra (LCN), and eventually rose to become the boss of the Family in approximately 1991.

Defendant and his counsel understood that no such plea agreement was possible without a full and complete proffer rather than the limited proffer provided to SAUSA Durham. Defendant and his counsel also understood that defendant would be required to testify against his codefendants in the pending racketeering case in order to earn a substantial assistance motion. Second, it was (and remains) axiomatic that no matter what cases defendant ultimately testified in, he had to provide a full and complete proffer to allow the government to adequately assess his credibility and potential usefulness as a witness. Both defendant and his counsel understood these fundamental concepts and agreed to participate in a full and complete proffer on November 2, 1999.

On November 2, 1999, defendant and his counsel met at the U.S. Attorney's Office prior to the proffer. Defense counsel excused himself upon the commencement of the proffer and returned several hours later. At no time during the proffer did the defendant (an individual well versed in the ways of the criminal justice system) request the presence of his attorney nor request that the proffer stop until his counsel returned. There were numerous prosecutors and investigators present at the proffer including SAUSA Durham and AUSAs Kelly and Wyshak.

During the proffer, the defendant was asked about the criminal activity which was the subject of the pending racketeering case as well as about a series of gangland slayings that had been committed while the defendant was boss of the Patriarca LCN Family including questions about the disappearance and presumed murder of Stephen DiSarro. These murders had been the subject of extended conversations with defendant's counsel prior to the proffer, and defendant's counsel had represented to the government attorneys that the defendant claimed to have no involvement in any post-1988 murders.

Defendant's counsel, Anthony Cardinale, has recently confirmed to government counsel that his client, defendant Salemme, assented to his partial absence during the 1999 proffer session. Attorney Cardinale also recalls AUSA Wyshak asking defendant Salemme a question about Stephen Disarro when attorney Cardinale was present and recalls that the proffer session was intended to cover all post-1988 conduct by Salemme (but not anything related to the 1960's). If necessary, the government will call attorney Cardinale as a witness at the hearing of these motions.

Subsequent to the November 1999 proffer, the U.S. Attorney's Office declined to provide the defendant with a plea agreement which included a substantial assistance provision. Instead, the defendant entered into a plea agreement which required him to plead guilty to all charges in the indictment on December 2, 1999.[3] The defendant was sentenced within the applicable U.S. Sentencing Guideline range to 136 months' incarceration on February 23, 2000.

In May 2002, the defendant testified as a government witness at the trial of <u>United States v. John Connolly</u>, Crim. No. 99-10428-JLT. In December 2002, a motion was filed by SAUSA Durham pursuant to Fed.R.Crim.P. 35(b) to reduce the defendant's sentence based upon the defendant's substantial assistance in the prosecution of John Connolly. In January 2003, the district court held a hearing on the motion and allowed a sentence reduction to time served plus sixty days for a total of 91 months' incarceration. At that hearing as well as in the Rule 35 motion itself, the government advised the district court that it had concerns about the defendant's candor regarding his involvement in a series of post-1988 murders.

---

[3]Defendant was not required to admit to facts surrounding four racketeering acts which alleged murders based upon the district court's finding that it would suppress evidence regarding those murders.

In January 2004, Stephen Flemmi pled guilty and agreed to cooperate with the United States. (See United States v. Stephen J. Flemmi, Crim. No. 99-10371-RGS.) Pursuant to that cooperation, Flemmi advised the government that he was present with defendant Salemme at the murder of Stephen DiSarro.

A subsequent grand jury investigation regarding the disappearance and murder of DiSarro revealed that not only had the defendant lied about his knowledge of DiSarro's disappearance, but he had also falsely incriminated others in DiSarro's disappearance and murder. The instant indictment (charging obstruction of justice and false statements) was issued against the defendant in October 2004.

II.    ARGUMENT

    A.    Defendant's Statements Should Not Be Suppressed

The defendant's motion to suppress is based upon his false claim that "he was unrepresented by counsel on or about November 2, 1999" and, therefore, his statements were involuntary. It is noteworthy that the claims in the defendant's brief are unsupported by any affidavit of the defendant or his then counsel, Anthony Cardinale. This is because the version of events detailed in his brief are a highly fictionalized account that bear little relationship to reality.

The documents submitted by the defendant described as "Suppression Attachments" objectively put the lie to the defendant's claims. First, the defendant had been represented by attorney Cardinale since at least 1995. They had been through extensive litigation together in the Salemme case. The fact that the defendant signed the proffer letter on November 1, 1999 clearly demonstrates that it was signed in anticipation of the November 2, 1999 proffer session. The fact that the interview report recites that the subject matter of the proffer session was "Salemme's

5

activities following his release from prison in 1988" demonstrates that the defendant's claim that he was surprised by the questioning is spurious.

Attorney Cardinale was present and did meet with the defendant at the U.S. Attorney's Office prior to the commencement of the proffer. As noted earlier, defendant's counsel (Anthony Cardinale, Esq.) has recently confirmed to government counsel that his client, defendant Salemme, assented to his partial absence during the 1999 proffer session. Attorney Cardinale also recalls that the proffer session was intended to cover all post-1988 conduct by Salemme (but not anything related to the 1960's). Thus, defendant Salemme clearly waived the presence of his counsel by proceeding with the proffer without attorney Cardinale being present for the entire session. Defendant Salemme has had extensive contacts with the criminal justice system and certainly knew that he was not required to speak to members of law enforcement. The defendant proceeded with the proffer because he believed that it was in his interest to do so.

The defendant also makes numerous contractual type claims that he alleges were violated by the proffer. However, the proffer letter clearly states that the letter "is the complete agreement between your client and the U.S. government." Nowhere in the proffer letter is there any mention of the limitations now alleged by the defendant.

The cases cited by the defendant are inapposite and do not address the circumstances of the case at bar where the defendant submits to a proffer pursuant to an agreement negotiated on his behalf by his attorney. Clearly, "a criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." United States v. Mezzanatto, 513 U.S. 196, 201 (1995). Accordingly, defendant's motion to suppress should be denied.

B.    The Indictment Should Not Be Dismissed

The defendant alleges that the indictment should be dismissed because "the grand jury presentation was incomplete, violating [Salemme's] right to due process and was secured by prosecutorial misconduct since the government failed to present exculpatory evidence to the grand jury." In making this claim, defendant ignores both the law and the facts.

The Supreme Court has clearly ruled: "If the grand jury has no obligation to consider all 'substantial exculpatory' evidence, we do not understand how the prosecutor can be said to have a binding obligation to present it." United States v. Williams, 504 U.S. 36, 53 (1992). The Williams Court stated flatly: "We reject the attempt to convert a nonexistent duty of the grand jury itself into an obligation of the prosecutor." Id.  In his twenty-seven page motion to dismiss, defendant Salemme cites Williams only once (in a string cite on page two) and makes no attempt to explain or distinguish its significance to the case at bar.

Close scrutiny of the defendants' allegations reveal that they are essentially the same as those made in Williams. In Williams, the district court found that the failure to present exculpatory evidence to a grand jury "substantially influenced the grand jury's decision to indict, or at the very least raised a grave doubt that the decision to indict was free from such substantial influence." Id. at 40-41.

In reversing the district court's dismissal of the indictment in Williams, the Supreme Court noted that its prior decision in Bank of Nova Scotia v. United States, 487 U.S. 250 (1988), limited the use of a court's supervisory power to dismiss an indictment to "one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'" Id. at 46, citing United States v. Mechanik, 475 U.S. 66, 74 (1986).

7

The Court identified these rules in a footnote: Rule 6 of the Federal Rules of Criminal Procedure; Title 18, Sections 6002, 6003, 1622, 1623 and 2515. <u>Id.</u> n.6.

In rejecting any notion that the courts could exercise their supervisory authority to prescribe prosecutorial standards of conduct before the grand jury, the Supreme Court stated,

> Because the grand jury is an institution separate from the courts, over whose functioning the courts do not preside, we think it clear that, as a general matter at least, no such "supervisory" judicial authority exists....

<u>Id.</u> at 47.

In <u>Williams</u>, the Court described the historical independence of the grand jury and emphasized,

> Given the grand jury's operational separateness from its constituting court, it should come as no surprise that we have been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure.

<u>Id.</u> at 49-50.  The Court further explained that the grand jury is not an adjudicatory body, but an accusatory body.

> It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge. (citation omitted) That has always been so; and to make the assessment it has always been thought sufficient to hear only the prosecutor's side.

<u>Id.</u> at 51.

In reiterating the principle that courts cannot scrutinize the legal sufficiency of the evidence presented to a grand jury, the Court noted,

> It would make little sense, we think, to abstain from reviewing the evidentiary support for the grand jury's judgment while scrutinizing the sufficiency of the prosecutor's presentation. A complaint about the quality or adequacy of the evidence can always be recast as a

> complaint that the prosecutor's presentation was "incomplete" and "misleading." Our words in Costello [v. United States, 350 U.S. 359, 364 (1956)] bear repeating: Review of facially valid indictments on such grounds "would run counter to the whole history of the grand jury institution[,] [and] [n]either justice nor the concept of a fair trial requires [it].

Id. at 54-55.

Factually, defendant's motion to dismiss largely revolves around the government's use of Stephen Flemmi as a witness before the grand jury. The defendant alleges that the government "used a witness whom [it] knew to be inherently incredible to present false information and thereby manipulated the grand jury by withholding [Flemmi's] history of lying and committing perjury." The defendant attempts to illustrates his point by reciting a litany of prior disparaging statements made by government counsel about Flemmi and Flemmi's credibility.

Of course, the defendant fails to note that the government attacks on Flemmi were made during the course of extremely contentious litigation surrounding Flemmi's false claims that he had been granted immunity from prosecution and was authorized to engage in criminal activity based upon his status as an FBI informant. As noted above, Flemmi has since pled guilty and has agreed to cooperate with the United States. He is currently serving a life sentence and has little motive to lie.

It is not unusual for a defendant to falsify testimony in the heat of his own defense, and subsequently tell the truth after he has been convicted and agreed to cooperate with the government. The critical factor is whether the government believed that Flemmi was lying when it presented his testimony to the grand jury. In the case at bar, the government had ample opportunity to evaluate Flemmi's statements generally and particularly as they related to the DiSarro murder. Based upon other corroborative information, the government has concluded that Flemmi has been truthful since

he began cooperating with the government and therefore presented Flemmi's testimony to the grand jury in the good faith belief that it was and remains the truth.

The defendant offers no evidence that the government knowingly presented false testimony to the grand jury. Also inaccurate is the defendant's contention that the government failed to provide sufficient evidence to the grand jury for the grand jury to judge Flemmi's credibility. In fact, Flemmi testified in detail before the grand jury about his lifetime of crime (including many murders) and admitted several times that he had committed perjury during the 1998 <u>Salemme</u> hearings.

In any event, as noted at the outset, the defendant's motion to dismiss must be rejected because it essentially asks this court to ignore the Supreme Court's decision in <u>Williams</u>.

C. <u>The Court Should Not Recuse AUSAs Wyshak and Kelly</u>

For the reasons set forth above, it is clear that the defendant's claims lack merit and should be rejected without an evidentiary hearing. If the Court determines that an evidentiary hearing is necessary, such a hearing can be conducted without the testimony of AUSAs Wyshak and Kelly because numerous other individuals were involved in the proffer process who can provide relevant testimony. Thus, defendant's one page recusal motion (which cites no legal precedent) should be denied.

Furthermore, even if testimony from either or both AUSAs Wyshak and Kelly is required at a pre-trial hearing, such testimony in the pre-trial context should not impact their ability to represent the government at the trial of this matter. While far from ideal, "the government prosecutor is not to be automatically disqualified as a witness or as trial advocate after testifying at a pretrial suppression hearing, but testifying and continuation as counsel shall be subject to the

sound discretion of the trial judge..." United States v. Johnston, 690 F.2d 638, 646 (7th Cir. 1982); United States v. Johnson, 131 F.Supp.2d 1088, 1107 (N.D. Iowa 2001).

        D.        <u>Defendant's Discovery Motion Should be Denied</u>

Defendant Salemme has also filed a boilerplate discovery motion which contains sweeping requests for information which go far beyond the requirements of the rules and case law governing pretrial discovery. Moreover, many of the items requested have already been provided to the defense via the government's nine Automatic Discovery letters. To date, the government has produced over 8,000 pages of discovery including grand jury transcripts and other early Jencks material that ordinarily is not produced until the time of trial or within 21 days of trial pursuant to Local Rule 116.2(B)(2).

Of course, the extent of permissible pretrial discovery is controlled and limited by Fed.R.Crim.P. 16 and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and its progeny. A prosecutor is not required to make files available to a defendant for an open-ended "fishing expedition" for possible <u>Brady</u> material. <u>United States v. Andrus</u>, 775 F.2d 825, 842-43 (7th Cir. 1985); <u>United States v. Davis</u>, 752 F.2d 963, 976 (5th Cir. 1985). Moreover, <u>Brady</u> does not require the Government to disclose evidence available to the defense from other sources, evidence the defendant already possesses, or evidence the prosecutor does not possess. <u>United States v. Hicks</u>, 848 F.2d 1, 3-4 (1st Cir. 1988); <u>United States v. Ramirez</u>, 810 F.2d 1338, 1343 (5th Cir.), <u>cert</u>. <u>denied</u>, 484 U.S. 844 (1987); <u>United States v. Mabry</u>, 809 F.2d 671, 686-87 (10th Cir.), <u>cert</u>. <u>denied</u>, 484 U.S. 874 (1987). As the First Circuit has stated, "[a]lthough the government's [discovery] obligation goes beyond the good-faith requirement of civil discovery, its bounds are not limitless." <u>United States v. Sepulveda</u>, 15 F.3d 1161, 1178 (1st Cir. 1993).

In fact, the Supreme Court has expressly rejected the notion that a defendant has a constitutional right to disclosure of every helpful fact or every fact that might be employed by a resourceful defense attorney. United States v. Agurs, 427 U.S. 97, 108-10 (1976). More recently, the Supreme Court in United States v. Ruiz, 536 U.S. 622 (2002), reversed the Ninth Circuit and ruled that the Constitution does not require the government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant. In so doing, the Supreme Court noted: "The Constitution does not require the prosecutor to share all useful information with the defendant." Id. at 629. Also in Ruiz, the Supreme Court cited Kyles v. Whitley, 514 U.S. 419 (1995), and provided a succinct definition of exculpatory evidence which is not nearly as expansive as the Kyles spin often pushed by the defense bar: "Exculpatory evidence is evidence the suppression of which would undermine confidence in the verdict." Id. at 628.

To the extent defense counsel's wildly expansive interpretations of the Local Rules are not supported by the caselaw, they should be rejected. Indeed, the First Circuit in Stern v. United States, 214 F3d 4, 13 (1st Cir. 2000) overturned a local rule on subpoenas to attorneys and stated: "A local rule must be both constitutional and rational...a local rule must be consistent with, but not duplicative of, Acts of Congress and nationally applicable rules of practice, procedure and evidence...Even if a local rule does not contravene the text of a national rule, the former cannot survive if it subverts the latter's purpose...They may not create or affect substantive rights or institute "basic procedural innovations." [4]

---

[4] See also, In Re U.S., 267 F.3d 132 (2nd Cir. 2001) wherein the Second Circuit discussed Brady issues at length while granting a government's request for a writ of mandamus overturning a district court's overly broad discovery order.

Accordingly, defendant's motion for discovery should be denied as moot because he has already received the material to which he is entitled at this stage of the proceedings. Government counsel will continue to comply with Rule 16, the Local Rules and <u>Brady</u> and its progeny.

III.  CONCLUSION

For the foregoing reasons, defendant's pretrial motions should be denied.

                        Respectfully submitted,

                        MICHAEL J. SULLIVAN
                        United States Attorney

By:  /s/ Brian T. Kelly
      BRIAN T. KELLY
      FRED M. WYSHAK, JR.
      Assistant U.S. Attorneys

DATED: April 13, 2007

CERTIFICATE OF SERVICE

Suffolk, ss.                                                            Boston, Massachusetts
                                                                                      April 13, 2007

I, Brian T. Kelly, Assistant United States Attorney, do hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.

                        /s/ Brian T. Kelly
                        BRIAN T. KELLY
                        Assistant U.S. Attorney